■ In the Matter of DAVID M. BARAD, Petitioner, v STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT, Respondent. [724 NYS2d 87] —Mercure, J. Proceeding pursuant to CPLR article 78 (initiated in this Court pursuant to Public Health Law § 230-c [5]) to review a determination of the Hearing Committee of the State Board for Professional Medical Conduct which, *inter alia*, suspended petitioner's license to practice medicine in New York for five years.

Petitioner, a physician specializing in obstetrics, gynecology and reproductive endocrinology, challenges a determination of a Hearing Committee of the State Board for Professional Medical Conduct finding him guilty of physically abusing a patient (*see*, Education Law § 6530 [31]) and engaging in conduct in the practice of medicine that evidences moral unfitness to practice medicine (*see*, Education Law § 6530 [20]), both arising out of petitioner's conceded consensual sexual relationship with a female patient (patient A) during an approximately three-month period ending in December 1996. Petitioner also challenges the penalty imposed, i.e., a five-year suspension of petitioner's license to practice medicine, with a stay of the last three years if petitioner completes continuing medical education courses or medical school classes on patient abuse. Because we conclude that the contentions advanced by petitioner are lacking in merit, the Hearing Committee's determination shall be confirmed and the petition dismissed.

Initially, we reject the argument that there was not substantial evidence in the record to support the Hearing Committee's finding of a physician-patient relationship between petitioner and patient A through December 2, 1996, the date when petitioner broke off their relationship. The record establishes

that patient A treated with petitioner at Montefiore Medical Center's Fertility and Hormone Center in an effort to become pregnant despite a prior tubal ligation. Active treatment was undertaken from February 1996 through August 8, 1996 and included unsuccessful in vitro fertilization and frozen embryo transfer procedures. According to petitioner and expert witnesses who testified on his behalf, in vitro fertilization and frozen embryo transfer treatments are cyclical in nature and the treatment ends with the conclusion of an in vitro fertilization cycle or a frozen embryo transfer. The expert evidence presented by petitioner indicated that the cycle of petitioner's final unsuccessful effort at a frozen embryo transfer concluded on August 20, 1996, when patient A was notified of the negative results of her pregnancy test.

Patient A, on the other hand, testified as to her belief that petitioner was still her physician during the affair because she never terminated her attempts to become pregnant and no one at the Center told her that she was no longer a patient. According to patient A, she was "instructed to wait after [the final unsuccessful treatment] before [she] tried again or what method they were going to recommend to [her] next." She also testified: "At that time just like before in between the other transfers he just counselled me: We are going to wait or try another method, because they had three or four different methods they used in the clinic, but I was never told other than that." Consistent with that view, patient A continued to recognize petitioner as her doctor and discussed her fertility problems and treatments with him during the time of their sexual affair, as confirmed by certain e-mails between petitioner and patient A. It is also noteworthy that petitioner met with patient A at his office on December 2, 1996 and on that occasion made an entry in her patient chart indicating that no further therapy was going to be pursued at that time.

Recognizing that credibility issues and the weight to be given the hearing evidence, including expert testimony, are matters exclusively within the province of the Hearing Committee, we conclude that the record provides substantial evidence to support the Hearing Committee's finding that the physician-patient relationship between petitioner and patient A continued to December 2, 1996 (*see, Matter of Reddy v State Bd. for Professional Med. Conduct*, 259 AD2d 847, 849, *lv denied* 93 NY2d 813; *Matter of Tames v DeBuono*, 257 AD2d 784, 786; *Matter of Weisenthal v New York State Bd. of Regents*, 249 AD2d 712, 713, *lv denied* 92 NY2d 808).

Next, we reject the contention that, because Education Law

§ 6530 (44) specifically proscribes sexual contact between a physician engaged in the practice of psychiatry and his or her patient, sexual contact between nonpsychiatrists and their patients cannot violate the more general proscription against engaging in conduct in the practice of medicine that evidences moral unfitness to practice medicine (*see,* Education Law § 6530 [20]). We have specifically held to the contrary in *Matter of Miller v Commissioner of Health for State of N. Y.* (270 AD2d 584) and, quite recently, in *Matter of Selkin v State Bd. for Professional Med. Conduct* (279 AD2d 720, 721-722).

Further, even if we were to accept petitioner's contention that the State Board for Professional Medical Conduct may not apply a per se prohibition against sexual contact between physician and patient but that a violation of Education Law § 6530 (20) may be found only where there is also a finding of lack of consent or other exacerbating circumstance reflecting the exploitation of a vulnerable patient, we conclude that such a showing, and concomitant finding, has been made in this case. Notably, the Hearing Committee's decision makes specific reference to the fact that petitioner, "as a fertility expert, is aware of the mental state of patients who have recently had a failed pregnancy transfer" and that petitioner responded to patient A's laments about an unhappy sex life with her husband "with explicit sexual detail of what his fantasy with her would be" (*see, Matter of Miller v Commissioner of Health for State of N. Y., supra,* at 585). Further, the Hearing Committee's decision makes specific reference to a written opinion of the American College of Obstetricians and Gynecologists, which includes the provision that: "Sexual or romantic interactions between physicians and patients detract from the goals of the physician-patient relationship, *may exploit the vulnerability of the patient,* may obscure the physician's objective judgment concerning the patient's health care, and ultimately may be detrimental to the patient's well-being" (emphasis supplied).

We similarly reject the attack on the Hearing Committee's finding of guilt on the charge of physical abuse. Contrary to petitioner's portrayal of his affair with patient A as a "brief consensual romantic relationship," the hearing evidence and the Hearing Committee's findings attest to patient A's fragile mental health, providing a sufficient basis for the conclusion that she was incapable of voluntarily entering into the relationship with petitioner.

As a final matter, we are not persuaded that the penalty imposed by the Hearing Committee is unduly harsh. Based on the evidence adduced at the hearing, which supports the

conclusion that patient A was an emotionally vulnerable fertility patient who was led into an extramarital sexual relationship by petitioner, we cannot find that "the penalty imposed is so disproportionate to the offenses sustained as to be shocking to this Court's sense of fairness" (*Matter of Addei v State Bd. for Professional Med. Conduct*, 278 AD2d 551, 553). Further, petitioner's argument that physicians in similar situations, whose conduct was in his opinion far more egregious than his, received less severe penalties overlooks the fundamental tenet that "each case must be judged on its own facts and circumstances" (*Matter of Moon Ho Huh v New York State Dept. of Health, Bd. for Professional Med. Conduct*, 256 AD2d 933, 935).

Cardona, P. J., Peters, Spain and Carpinello, JJ., concur. Adjudged that the determination is confirmed, without costs, and petition dismissed.