◼ In the Matter of CHARLES GANT, Petitioner, v ANTONIA C. NOVELLO, as Commissioner of Health of the State of New York, et al., Respondents. [754 NYS2d 746] —Spain, J. Proceeding pursuant to CPLR article 78 (initiated in this Court pursuant to Public Health Law § 230-c [5]) to review a determination of the Hearing Committee of the State Board for Professional Medical Conduct which suspended petitioner's license to practice medicine in New York for five years.

Petitioner, a physician licensed to practice in New York since 1980 who specializes in the nonconventional field of orthomo-

lecular medicine,[1] was charged by the Bureau of Professional Medical Conduct with 74 specifications of misconduct under Education Law § 6530. The charges included gross negligence, gross incompetence, negligence on more than one occasion, incompetence on more than one occasion, fraud, moral unfitness, excessive testing, filing a false report, receiving consideration from a third party for patient referral and failing to maintain adequate records. The allegations stem from petitioner's treatment of nine patients from 1998 to 2000, as well as reports that petitioner had, among other things, misrepresented his credentials, utilized a laboratory to conduct diagnostic tests for which it was not certified in New York and received improper consideration from a nutritional supplement company in which he had an ownership interest.

After a hearing which spanned 18 days, a Hearing Committee of the State Board for Professional Medical Conduct (hereinafter Committee) sustained many of the charges. Specifically, the Committee found that petitioner had, among other things, repeatedly failed to obtain complete medical histories for his patients, failed to perform required physical examinations, failed to document his diagnoses, prescribed medications without documenting an adequate medical indication, ordered tests from a laboratory not certified to do such tests, documented diagnostic codes which did not accurately reflect the treatment actually provided, provided patients with erroneous diagnostic codes on their billing statements and misrepresented his credentials. The Committee further found that petitioner had improperly prescribed nutritional supplements which were exclusively sold by a company in which he had an interest and from which he received consideration. The Committee ordered the suspension of petitioner's license to practice medicine for five years, but stayed all but six months of the suspension subject to petitioner's successful completion of courses to the satisfaction of the Director of the Office of Professional Medical Conduct (hereinafter OPMC). The Committee placed petitioner on probation for 4½ years, set to commence upon the termination of the actual/unstayed suspension period, subject to nine specific terms and conditions. Petitioner then commenced this CPLR article 78 proceeding seeking to annul the Committee's determination raising numerous issues, none of which merits disturbing the Committee's determination or sanction.

Initially, we reject petitioner's argument that OPMC's

---

1. Petitioner defines orthomolecular medicine as the process of " 'straightening out or correcting' * * * the molecules [and] harmful toxic substances * * * that are found to be present in the body."

investigation was conducted in violation of the Public Health Law based upon its failure to consult an expert in nonconventional medicine. As relevant here, Public Health Law § 230 (10) (a) (ii) codifies—in part—the Alternative Medical Practice Act (L 1994, ch 558) as follows: "If the investigation of cases referred to an investigation committee involves issues of clinical practice, medical experts * * * shall be consulted. Experts *may* be made available by the state medical society of the state of New York, by county medical societies and specialty societies, and by New York state medical associations dedicated to the advancement of non-conventional medical treatments" (emphasis added). Contrary to petitioner's assertion, the plain language of this provision merely provides OPMC with the discretion to choose nonconventional medical experts to assist in its investigations. Here, during the investigation of petitioner, OPMC consulted as an expert William Maliha, a licensed physician board certified in emergency and family medicine and certified in hyperbaric medicine—considered to be an area of nonconventional medicine—and trained in psychiatric medicine. Clearly, he was qualified as an expert for the purpose of determining whether petitioner's conduct met accepted standards of care for physicians in New York, despite his minimal training or background in nonconventional medicine.

Next, our review of the voluminous record establishes that petitioner's contention that Maliha's hearing testimony reflected his bias against nonconventional medicine is unfounded. Petitioner neither presented "persuasive evidence" in support of this assertion (*Matter of Metzler v New York State Bd. for Professional Med. Conduct*, 203 AD2d 617, 619, *appeal dismissed* 83 NY2d 999; *see Matter of Lauersen v Novello*, 293 AD2d 833, 834; *Matter of Sunnen v Administrative Review Bd. for Professional Med. Conduct*, 244 AD2d 790, 791-792, *lv denied* 92 NY2d 802) nor demonstrated "a factual basis to support the claim and proof that the outcome flowed from the alleged bias" (*Matter of Kabnick v Chassin*, 223 AD2d 935, 936, *affd* 89 NY2d 828; *see Matter of Lauersen v Novello, supra* at 834). The conclusions of petitioner's experts that Maliha's comments and statements indicated a strong bias against nonconventional medicine do not persuasively establish such bias; rather, they reflect the existence of credibility issues among the competing experts, the resolution of which was "within the exclusive province of the Hearing Committee" (*Matter of O'Keefe v State Bd. for Professional Med. Conduct*, 284 AD2d 694, 695, *lv denied* 96 NY2d 722; *see Matter of Peress v Administrative Review Bd. for Professional Med. Conduct*, 294

AD2d 753, 754; *Matter of Gupta v DeBuono*, 229 AD2d 58, 60). A careful review of the record reveals that Maliha took very strong issue with petitioner's own individual procedural and substantive approaches to medicine, rather than with the field of nonconventional medicine in general.

Likewise rejected is petitioner's assertion that, as a practitioner of orthomolecular medicine, he cannot be held to the same standards of care which are traditionally used to evaluate medical care rendered by practitioners of conventional medicine. Notwithstanding the difference in treatment regimes between nonconventional and conventional physicians, this Court has held that all physicians who are licensed to practice in New York may be held to the same standards of care (*see Matter of Gonzalez v New York State Dept. of Health*, 232 AD2d 886, 888-889, *lv denied* 90 NY2d 801; *Matter of Metzler v New York State Bd. for Professional Med. Conduct, supra* at 619). Moreover, contrary to petitioner's assertions, these standards are well recognized. For example, this Court has held that a physician is guilty of negligence on more than one occasion— one of the charges sustained against petitioner—when that physician fails " 'to exercise the care that a reasonably prudent physician would exercise under the circumstances' " (*Matter of Gonzalez v New York State Dept. of Health, supra* at 889, quoting *Matter of Bogdan v New York State Bd. for Professional Med. Conduct*, 195 AD2d 86, 88, *appeal dismissed and lv denied*, 83 NY2d 901; *see* Education Law § 6530 [3]; *Matter of Schoenbach v DeBuono*, 262 AD2d 820, 822, *lv denied* 94 NY2d 756), and that "[a] medical record which 'fails to convey objectively meaningful medical information concerning the patient treated to other physicians is inadequate' " (*Matter of Gonzalez v New York State Dept. of Health, supra* at 890, quoting *Matter of Mucciolo v Fernandez*, 195 AD2d 623, 625, *lv denied* 82 NY2d 661). Further, this Court has sustained a finding of fraud against a physician based upon "evidence of an intentional misrepresentation or concealment of a known fact with intent to deceive" (*Matter of Pearl v New York State Bd. for Professional Med. Conduct*, 295 AD2d 764, 766, *lv denied* 99 NY2d 501; *see Matter of Corines v State Bd. for Professional Med. Conduct*, 267 AD2d 796, 799-800, *lv denied* 95 NY2d 756). Additionally, the charges of moral unfitness, filing a false report and receiving consideration which the Committee sustained against petitioner are statutorily provided (*see* Education Law § 6530 [18], [20], [21]). That these violations are not defined with greater specificity is not significant, as the statutes employ "terms [which] provide sufficient warning that physicians must practice their profession in accordance with reasonable medical

standards" (*Matter of Binenfeld v New York State Dept. of Health*, 226 AD2d 935, 936, *lv dismissed* 88 NY2d 1052). Finally, petitioner's assertion that none of the patients was actually harmed by his treatment is irrelevant to the standards of care applied by the Committee, as a showing of harm to patients is not a prerequisite to proving that petitioner exercised substandard care (*see Matter of Loffredo v Sobol*, 195 AD2d 757, 760, *lv denied* 82 NY2d 658).

With respect to petitioner's nine patients who were the focus of the OPMC investigation, the record fully supports the findings that petitioner—in most, if not all, of the cases—recurrently failed to meet acceptable standards of care in that petitioner failed to obtain an adequate medical history; failed to perform and document an adequate physical examination; failed to form and document an accurate initial and working diagnosis (although he may have formed—as to some patients—an accurate diagnosis); prescribed medication without documenting adequate medical indications; sent specimens for testing to a diagnostic laboratory which he knew or should have known was not certified by this state to perform such tests; failed to maintain accurate medical records; knowingly documented diagnostic codes for which no evaluation or treatment was provided; and placed such erroneous diagnostic codes on the patients' bills knowing that they would use these bills to seek reimbursement under their third-party health coverage. There is also ample support in the record for the Committee's finding that, as charged, petitioner improperly received consideration from a nutritional supplement company which exclusively distributed and sold the supplements and nutrient formulae which petitioner prescribed to his patients, a business in which he had an ownership interest. Petitioner received consideration from the company in the form of the promotion of his medical practice and of a book he had authored. Also well documented is the finding that petitioner misrepresented his credentials when he advertised that he was trained in family practice and psychiatry, knowing that he had not satisfactorily completed the required residency for either of these specialties. Accordingly, there is substantial record evidence to support the Committee's determination sustaining the charges that petitioner practiced the profession with negligence on more than one occasion, practiced his profession fraudulently, engaged in conduct which evidences moral unfitness, filed false reports, received consideration from a third party for patient referrals and failed to maintain accurate records.

We next reject petitioner's contention that the presiding

Administrative Law Judge (hereinafter the ALJ) violated his right to due process during the hearing by, among other things, denying his objection to the composition of the Committee. Petitioner asserts that the Committee should have been comprised of physicians familiar with nonconventional medicine, citing the Alternative Medical Practice Act (L 1994, ch 558), which amended the Public Health Law to require that at least two of the 18 physicians on the State Board for Professional Medical Conduct be "physicians who dedicate a significant portion of their practice to the use of non-conventional medical treatments" (Public Health Law § 230 [1]). As this Court has held, this legislation does not mandate that a Committee hearing a case involving a nonconventional practitioner contain a nonconventional physician member (*see Matter of Gonzalez v New York State Dept. of Health*, 232 AD2d 886, 888, *supra*; *Matter of Metzler v New York State Bd. for Professional Med. Conduct*, 203 AD2d 617, 619, *supra*).[2] The ALJ also properly excluded testimony of patients and family members as to their satisfaction with their treatment, reasoning that they were not medical experts and, therefore, their testimony was irrelevant to the issues before the Committee (*see Matter of Moreland v Ambach*, 111 AD2d 533, 534, *lv denied* 65 NY2d 610).[3] Regarding the ALJ's exclusion from evidence of the book authored by petitioner, "[i]t has long been the rule that statements in medical books, even if considered authoritative, are not admissible in evidence as proof of the facts or opinions contained therein" (*Matter of Morfesis v Sobol*, 172 AD2d 897, 897, *lv denied* 78 NY2d 856). In sum, none of the challenged evidentiary rulings deprived petitioner of his due process right to a fair hearing, especially when petitioner was given ample opportunity at this lengthy hearing—covering 18 days, almost 4,000 pages of documents and testimony including three experts and several fact witnesses appearing for petitioner—to defend against the charges.

Finally, petitioner's contention that the penalty imposed is disproportionate to the charges sustained by the Committee is without any merit. Given the findings of the Committee and the record support for those findings, we cannot say that the penalty was inappropriate (*see Matter of O'Keefe v State Bd. for Professional Med. Conduct*, 284 AD2d 694, 696-697, *lv denied* 96 NY2d 722). In our view, the penalty reflects leniency and

---

**2.** Here, one of the members of the Committee was a physician who practices both conventional and nonconventional medicine.

**3.** Notably, one patient and one family member were permitted to give limited testimony.

was a proper exercise of the Committee's discretion, following a comprehensive and thorough assessment of the evidence relating to the numerous charges and full consideration of mitigating circumstances, the differing backgrounds of the experts and the unique nature of petitioner's specialty. The Committee also provided petitioner with the opportunity to reinstate his license after a period of only six months upon his satisfactory completion of course work designed to improve the manner in which he conducts and documents physical examinations, his record keeping and his coding methods. In light of the Committee's findings, we cannot say that the penalty was an abuse of discretion.

We have considered petitioner's remaining contentions and find them to be without merit.

Crew III, J.P., Carpinello, Lahtinen and Kane, JJ., concur. Adjudged that the determination is confirmed, without costs, and petition dismissed.